UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
:
UNITED STATES OF AMERICA            : **MEMORANDUM**
: **DECISION AND ORDER**
:
       - against –                     : 15-cr-559 (BMC)
:
:
DADA MOSES OLADOKUN,             :
:
                  Defendant.   :
---------------------------------------------------------- X

**COGAN**, District Judge.

    This case is presently before me on defendant's motion to suppress certain statements he made to Customs and Border Patrol and Diplomatic Security Service, and information they obtained from his cellphone. I find that although the officer interrogated defendant, he was not in custody at the time; there was no unreasonable delay in his presentment; he did not validly invoke his right to an attorney; he read, understood, and voluntarily signed a waiver of his Miranda rights; and the search of his cellphone was lawful. His motion to suppress is therefore denied.

### BACKGROUND

    The Indictment alleges that on or about October 17, 2015, defendant attempted to use and possess a nonimmigrant visa, knowing that the document was procured by false statements and by fraud, and was unlawfully obtained. Defendant disembarked a plane from Lagos, Nigeria at JFK International Airport and presented a valid Nigerian passport and a valid B1/B2 US entry visa. The visa was issued by the US Embassy in Lagos, Nigeria on or about April 30, 2014.

Defendant was interviewed three times on Saturday, October 17, 2015. First, he was subject to initial questioning by Customs and Border Patrol ("CBP") agents when he presented his Nigerian passport and his B1/B2 entry visa.

Next, defendant was referred to secondary inspection at approximately 6:57 a.m., where he was questioned by a CBP officer from the Criminal Enforcement Unit (the "CBP interview"). The CBP interview took place in a private room away from the other passengers. Defendant was not restrained during the interview. The officer was in uniform with his weapon visible, although the weapon was never drawn. During this interview, defendant was questioned about his visa, including specific details about his job, his telephone numbers, and information about the agent who helped him fill out the visa application. The officer continued to ask defendant questions, during which time he made statements that were inconsistent at best and, at worse, inculpatory. At one point, defendant was instructed to show information on his cell phone and, after being told to give his cell phone to the officer, it was taken from defendant and placed beside the officer on the table. The CBP interview lasted roughly 50 minutes. The officer terminated the investigation on suspicion that defendant had committed visa fraud.

When the CBP interview concluded, defendant was taken from the room where the CBP interview took place and brought to a separate area, during which time he was given the opportunity to eat. He waited there for several hours. He was not restrained during this time.

Defendant was then subject to a third and final interview by the Diplomatic Security Services ("DSS") special agents beginning at approximately 12:00 p.m. (the "DSS interview"). Defendant was Mirandized at the time of the interrogation and, despite having stated twice that he would like an attorney, he signed the form waiving his Miranda rights. After doing so, defendant made further statements to DSS, including statements that were similar to or

expounded upon statements he had previously made during the CBP interview. The interview ended at approximately 1:25 p.m. He was arraigned on the criminal complaint on Monday, October 19, 2015, at approximately 2:00 p.m.

Defendant moves to suppress all of his statements to CBP and DSS while he was in custody at JFK airport. Defendant argues that he was in custody beginning with the CBP interview.

Defendant makes four arguments in favor of suppression: (1) his statements during the CBP interview were obtained in violation of his Miranda rights, and DSS's interrogation significantly overlapped; (2) there was an unreasonable delay in presentment; (3) defendant invoked his right to counsel; and (4) defendant's waiver of his Miranda rights was not knowing and intelligent. In addition, defendant alleges that the agents searched his cellphone without his consent, and it is undisputed that there was no warrant.

In determining this motion, I have had the benefit of reviewing video recording of the interviews and the able arguments of counsel.

## DISCUSSION

### I. The CBP Interview

The first issue is whether the CBP interview, which took place in the private room after initial questioning, was a custodial interrogation.

The CBP interview does not meet the standard for a custodial interrogation. Assuming that the officer was there to elicit incriminating statements, and defendant was therefore being interrogated, defendant's rights were not violated unless he was also in custody. See United States v. FNU LNU, 653 F.3d 144 (2d Cir. 2011). The central question is objective: whether a

3

reasonable person under the circumstances would have felt he was not at liberty to terminate the interrogation and leave.  See id.; Thompson v. Keohane, 516 U.S. 99 (1995).  The overarching question is whether "a reasonable [person] in the suspect's position would have understood" himself to be "subjected to restraints comparable to those associated with a formal arrest." Georgison v. Donelli, 588 F.3d 145, 155 (2d Cir. 2009) (internal citations omitted).

Defendant's statements to the CBP officer, once brought back to the private room, were made over a period of less than an hour.  "[A]t least initially, every traveler in the airport must submit to the same sort of questioning while not free to leave" which thereby "reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest." FNU LNU, 653 F.3d at 154.  An individual traveling on a visa would expect that follow up questions may be asked, and that these questions could take some time.  Less than an hour of questioning does not rise to the level of custody in the border context, particularly when the traveler is able to terminate the interview, albeit with the understanding that they will be denied entry into the United States.

The types of questions asked, however, may transform what is otherwise a routine inspection to a custodial interrogation.  The Government points to two cases, United States v. Wilson, 100 F. Supp. 3d 268 (E.D.N.Y. 2015), and United States v. Rijo-Carrion, 11-CR-784, 2012 WL 6617388 (E.D.N.Y. Dec. 19, 2012), in support of its argument that the CBP interview was a routine inspection and did not amount to custody.  In Wilson, Judge Brodie held a hearing at which the CBP officers and a Homeland Security officer testified.  She found that the defendant was selected for luggage inspection at the border and, after the officer opened up a bottle of baby powder and believed it to be cocaine, the defendant was handcuffed and brought to a private room.  Between being handcuffed and being Mirandized, the defendant testified that

4

he had been asked how he could afford to take so many trips, told that he must have done this before, and asked how he got the counterfeit money found in his luggage. Judge Brodie found that the defendant's statements pre-arrest were not the product of custodial interrogation because the totality of the circumstances evidenced that defendant was not in custody, in part because she credited the CBP officers' testimony that the defendant was not threatened with a lengthy jail sentence, told he was in a lot of trouble, or asked to confess. Id. at 280. In Rio-Carrion, Judge Mauskopf found that the statements that the defendant sought to have suppressed were in response to routine questions at the border – whether a suitcase was his – and that the defendant was not in custody because he was merely asked to step out of line to a secondary screening area. 2012 WL 6617388 at *3.

In contrast, in United States v. Carr, 63 F. Supp. 3d 226 (E.D.N.Y. 2014), Judge Brodie found that the pre-Mirandized statements were the result of a custodial interrogation because the questions and comments went specifically to the crime of importing drugs and were meant to solicit an incriminating response by the defendant. In that case, the officers asked the defendant about the weight of the drugs found in his luggage, about who owned the drugs, and, according to the defendant, about his experience smuggling drugs.

The cases elucidate the distinction between certain types of questions at the border – were the questions at issue going to a crime, or to admission into the United States? In cases involving the importation of drugs, this distinction is clear. In this case, however, the questions that one would expect to be asked in relation to entering the country on a particular type of visa overlap substantially, if not entirely, with questions that would incriminate someone if that person had committed visa fraud. This overlap does not mean that the questions should be viewed as going to a potential crime. The questions are still the types of questions normally

5

asked at the border, to confirm the traveler's identity and paperwork, and a reasonable person in defendant's position would consider them so. "[A] reasonable person would recognize all [of the officer's] questions as relevant to her admissibility to the United States. Such a person would consider them par for the course of entering the country from abroad." FNU LNU, 653 F.3d at 155.

As defendant indicated at oral argument, this may mean that defendant has no choice but to incriminate himself if he responds to the questions pertaining to his visa. However, that would only be true, first, if the defendant had committed visa fraud, and, second, if he elected not to stay silent with the understanding that he would be denied entry. Indeed, my assessment of the evidence in this case is that defendant was not concerned about indictment for visa fraud; he was weighing whether to keep trying to get into the country, or give it up and simply allow the authorities to return him to Lagos – even if those were not actually his options. The possibility of criminal prosecution, and therefore that he was "in custody" in anticipation of such a prosecution, was simply not on his mind.

Defendant's post-argument submission supports this interpretation of defendant's actions and statements. According to the letter, "Operation Haystack" was undertaken to prosecute those who were suspected of visa fraud that, prior to the operation, were merely "interviewed and then returned on the next flight to their country of origin." The letter makes it clear that "[f]raudulent travelers are often coached and prepared by their document vendors prior to seeking illegal entry into the U.S., and these travelers . . . were never coached or prepared for any other consequence than being turned around and sent home." That the stakes had been raised and the authorities more inclined to prosecute than simply repatriate does not bear on whether a reasonable person in defendant's position would have believed himself to be in custody. Even

6

persons who had committed visa fraud would not have understood themselves to be "subjected to restraints comparable to those associated with a formal arrest," Georgison, 588 F.3d 145 at 155, and, as discussed, other reasonable persons under the circumstances would have expected the questions asked where they were intended to confirm the identity of the traveler and the accuracy of his paperwork. FNU LNU, 653 F.3d at 155.

That a reasonable person in defendant's position would believe that he could terminate the interview and be returned to his country of origin, along with the fact that the officer never drew his weapon and no physical restraints were used, see id., militate against finding that defendant was in custody during the second interview. Defendant's statements during the CBP interview were not obtained in violation of his Miranda rights.

Having found that defendant was not in custody for the secondary questioning, I do not need to reach the issue of whether the post-Miranda statements should be suppressed due to a deliberate two-step process under Missouri v. Seibert, 542 U.S. 600 (2004). "If the initial statement was not obtained in violation of defendant's Miranda rights . . . there is no need to go further" in the Seibert analysis. United States v. Moore, 670 F.3d 222, 229 (2d Cir. 2012).

Further, because defendant was not in custody until after the CBP interview, all of defendant's statements fall within the six-hour safe harbor provided for confessions. 18 U.S.C. § 3501(c); Corley v. United States, 556 U.S. 303, 129 S. Ct. 1558 (2009). In addition, defendant's processing was not completed on that Saturday until after the presumptive cut-off time for the weekend duty magistrate, and defendant did not suffer prejudice due to the delay; he had already made inculpatory statements by the time he was taken into custody, and the additional delay was not purposeful or used for an unlawful and coercive interrogation. See United States v. Rubio, 709 F.2d 146, 154 (2d Cir. 1983). "[T]he failure to observe [the] arraignment time requirement,

standing alone, [does] not serve as sufficient basis to suppress" defendant's statements. Id. Under these circumstances, the delay in bringing defendant before a magistrate was reasonable.

## II. The DSS Interview

Defendant also argues that he invoked his right to counsel during the DSS interview, and statements made thereafter should be suppressed. If a defendant states that he wants an attorney, the interrogation must cease until an attorney is present; however, the defendant must clearly and affirmatively invoke that right. See United States v. Medunjanin, 752 F.3d 576, 585 (2d Cir. 2014). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994).

Here, defendant did ask for counsel at two points. However, at each point, defendant immediately equivocated. The first time, after defendant stated he wanted an attorney, the DSS agents promptly indicated that they were ending the interview. Immediately, defendant asked how long it would take and whether it would "wrap it up now." The agent responded that he (the agent) was confused, and defendant then stated he wanted to know "where this is going." The agents stated that they couldn't tell him where it was going, and that they were going to gather facts and bring them to the "decision-makers."

The second time, defendant requested that the agents present a lawyer for him, but, without prompting, followed it up with questions about whether it would take long. The agents responded that they did not know how long it would take.

8

Defendant then appeared to calculate whether he was willing to wait for an attorney or answer the questions. Defendant seemed to be considering which method would get him entry into the United States the fastest and therefore was weighing the efficiency of waiting for a lawyer versus proceeding without one. In my view, in both instances where he mentioned an attorney, defendant was clearly indicating to the agents that he was reconsidering whether to have an attorney if it meant it would take a long time to get one. In other words, if the agents, for example, had an attorney for him waiting down the hall, then he would want an attorney. But if it was going to take some time, then he would want to decide whether keep trying to talk his way into the country or accept the fact of repatriation.

Under the circumstances, it was reasonable for the agents to continue talking to a defendant who re-engaged them and asked specific questions about where this was going or how long it would take, and to believe defendant was still considering whether to request counsel. A reasonable officer would not have understood that defendant had unequivocally invoked his right to counsel. See Davis, 512 U.S. at 459, 114 S. Ct. at 2355. It was simply not a clear and affirmative invocation.

Defendant also argues that the statements made in the DSS interview must be suppressed because defendant's waiver of his Miranda rights was not knowing, intelligent, or voluntary. Specifically, he contends that the agents and officer deceived him about who they were, what their purpose was, and what they would do for him, such that his will was overborn.

The inquiry into voluntariness asks whether, based on the totality of the circumstances, the officer and agents' conduct "was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined." United States v. Kaba, 999 F.2d 47, 51 (2d Cir. 1993) (quoting United States v. Guarno, 819 F.2d 28, 30 (2d Cir. 1987)). A confession is

involuntary if it is obtained by "techniques and methods offensive to due process, or under circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will." Oregon v. Elstad, 470 U.S. 298, 304, 105 S. Ct. 1285, 1290 (1985) (citation and internal quotation marks omitted).

However, a valid waiver "does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might . . . affec[t] his decision to confess.'" Colorado v. Spring, 479 U.S. 564, 576, 107 S. Ct. 851, 859 (1987) (quoting Moran v. Burbine, 475 U.S. 412, 422, 106 S. Ct. 1135, 1142 (1986)). The Constitution does not require that the police "supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." Id. Here, the officer and agents failed to inform defendant that he was under investigation, but informed defendant that they were taking the information to someone else for them to determine what needed to be done. Defendant need not be aware of all the possible subjects of questioning in advance of interrogation. Id.

In determining whether defendant's will was overborn such that his waiver of rights was involuntary, I am to consider factors including "the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation." United States v. Okwumabua, 828 F.2d 950, 953 (2d Cir. 1987). The case law is clear that the officer and agents were not required to give defendant all of the information regarding the interview before he waived his rights, including whether he was being criminally investigated and the true identity of the agents.

Okwumabua is instructive on this point. In that case, the defendant met with investigators several times. On one of those occasions, the investigators went to the defendant's

10

office, and one was identified merely as a member of the Inspector General's Office. The investigator was not identified as a special agent, nor was the defendant told that allegations of fraud or false statements were being investigated. No threats or promises were made to the defendant, and he was not restrained, confined, or placed under arrest at any time, but Miranda warnings were not given. The district court suppressed the statements made during that meeting, but the Second Circuit reversed. In doing so, the panel noted that "[s]ilence by a government agent can only be equated with an affirmative misrepresentation where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading," and found that there was no duty to do so in that case. Id. at 953.

The same holds true here. Defendant had the waiver form with the rights at his disposal, which the video makes clear he contemplated and about which he inquired. The agents' statements in response to defendant's questions were not untrue, even if those answers did not inform defendant that they were special agents, or that an allegation of visa fraud was being investigated. As they informed defendant, they were not the decision-makers; rather, they were gathering facts that they would bring to someone else, and they could not make promises as to the outcome of defendant's interview or, as defendant put it, "where it was going." Defendant's failure to appreciate that he would be implicating himself in a crime by speaking with the agents is not the product of improper conduct by the Government.

This is not to say that the agents made no effort to deceive defendant, both before and after the DSS interview began. It is very likely, in fact, that they intended to deceive defendant so that he would talk to them further. It is also possible that the officer simplified his explanations to defendant, with whom he had trouble earlier conversing, so that he would not confuse defendant by referencing departments or agencies with which defendant was not

familiar. Thus, the officer told defendant during the CBP interview that he would bring in people from the "Visa Department" to help him "fix" his visa problem. As defendant was contemplating signing the waiver in the DSS interview, the officer introduced him to the "visa people," who were actually there from DSS to investigate a crime.[1]

But what the CBP officer or DSS agents did not do was to say anything to defendant that was inconsistent with the waiver of rights that he was considering signing, and ultimately did sign. They never told defendant that he could not have a lawyer, never told defendant that his statements could not be used against him in a criminal prosecution, and never suggested to defendant that the law required him to speak. None of the representations were inconsistent with defendant's Miranda rights or overrode the document at defendant's fingertips informing him of those rights.

This low level of deception, when coupled with the verbal recitation and written rights, did not overbear defendant's will. The Second Circuit has indicated that "the presence of a direct or implied promise of help or leniency alone has not barred the admission of a confession where the totality of the circumstances indicates it was the product of a free and independent decision." Green v. Scully, 850 F.2d 894 (2d Cir. 1988). Even if they did mislead him, "[t]rickery does not make it impossible *per se* to find that a defendant voluntarily waived his rights." United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991).

The circumstances here do not rise to the same level as those contemplated in Anderson or Okwumabua, where defendant here was informed both orally and in writing – and not misinformed – of his Miranda rights. That statements he made could be used against him in

---

[1] It is unclear what the DSS agents knew about what the CBP officer had told defendant during the CBP interview and therefore the extent of the deception when the officer told defendant that the agents were from the Visa Department.

12

court was known to him, because it was written on the form. Further, defendant is able to read and understand English; he attended university; and he was able to discuss his visa during the consulate interview in Lagos such that he convinced the consular officer that he was attending a Poultry Science convention in the United States. Defendant acknowledged both the rights on the phone and his predicament by stating aloud that he had already made statements, i.e., that could be used against him in court. Lastly, "[t]he conditions of the interview were not harsh or confining, and the officers' conduct was professional. [Defendant] was not 'subjected to any threats, physical coercion, or protracted interrogation.'" United States v. Konn, 634 F. App'x 818, 822 (2d Cir. 2015) (citing Okwumabua, 828 F.2d at 953).[2]

### III. Search of Defendant's Cellphone

Lastly, as to the search of defendant's cellphone, the Second Circuit continues to give deference to searches conducted at the border where they are routine, including where there is an absence of reasonable suspicion that the prospective entrant has committed a crime, even after Riley v. California, __ U.S. ___, 134 S. Ct. 2473 (2014). See United States v. Levy, 803 F.3d 120 (2d Cir. 2015). Nor did the officer download data from defendant's phone as was the case in Riley. In fact, defendant several times handed his phone to the officer or agents and, at one point, gave the agents express consent to search his phone.

Moreover, as noted by the Government, it is unclear what information defendant seeks to suppress on the basis of unlawful searches of the cell phone. Defendant's inculpatory statements

---

[2] Defendant also asserted at oral argument that, if defendant did not invoke because he did not know the circumstances under which he was being interview, it goes to the totality of the circumstances indicating that he was deceived and could not have voluntarily waived his rights. But this muddles the issue of defendant's right to counsel with his waiver of rights. The circumstances of one may certainly affect the other, but because, as discussed above, the officer and agents are able to (1) conceal the purpose of the interview, and (2) mislead defendant, it follows that they may do both at the same time where the rights being waived are clearly given, not inconsistent with the statements by officers, and other coercive conditions are not present.

about his profession and his use of an agent to fill out his visa occurred separately from the information obtained from the cell phone. The name and telephone numbers of people who allegedly aided him in committing visa fraud are not relevant to defendant's guilt so much as to his level of cooperation in investigating larger visa fraud schemes.

## CONCLUSION

Defendant's motion to suppress is denied.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
       July 27, 2016